Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
**SWIGART LAW GROUP, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 866-219-3343
F: 866-219-8344

*Attorneys for Plaintiff Shahnaz Zarif and The Putative Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHNAZ ZARIF, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br><br>HWAREH.COM, INC.,<br><br>Defendant. | CASE NO:  **'23CV0565 CAB DEB**<br><br>CLASS ACTION<br><br>COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>1.  THE WIRETAP ACT, 18 U.S.C. § 2510 ET SEQ;<br>2.  THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PEN. CODE § 631;<br>3.  VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE § 56, ET SEQ.<br>4.  VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.100, ET SEQ.<br><br>**JURY TRIAL DEMANDED** |

1

**INTRODUCTION**

1.   Plaintiff Shahnaz Zarif on behalf of herself and all others similarly situated, allege as follows upon personal knowledge as to their own conduct and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

2.   Shahnaz Zarif ("Plaintiff"), individually and on behalf of all other similarly situated consumers ("Class Members"), brings this action for damages and injunctive relief against HWAREH.COM, INC. ("Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the Federal Wiretap Act, 18 U.S.C. §2510 et seq (the "Wiretap Act") and the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 631, in relation to the unauthorized interception, collection, recording, and dissemination of Plaintiff's and Class Members' communications and data.

3.   The Federal Legislature passed the Wiretap Act to protect the privacy of the people of the United States. The Wiretap Act is very clear in its prohibition against intentional unauthorized taping or interception of any wire, oral, or electronic communication.  In addition to other relevant sections, the Wire Tap Act states that any person who;

> "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" has violated the act.  18 U.S.C. §2511.

4.     The California State Legislature passed CIPA to protect the right of privacy of the people of California. The California Penal Code is very clear in its prohibition against unauthorized tap or connection without the consent of the other person:

> "Any person who, by means of any machine, instrument, or contrivance, or any other matter, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable. Or instrument of any internal telephonic communication system, or who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state [violates this section]." Cal. Penal Code § 631(a).

5.     This case stems from Defendant's unauthorized interception and connection to Plaintiff's and Class Members' electronic communications through the use of Facebook Pixel and other spyware that allowed Defendant to read, learn the contents of, and make reports on Plaintiff's and Class Members' interactions on Defendant's website.

6.     Plaintiff brings this action for every violation of the Wiretap Act which provides for statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510 et seq under 18 U.S.C. §2520.

7.     Plaintiff also brings this action for every violation of California Penal Code § 631 which provides for statutory damages of $5,000 for each violation, pursuant to California Penal Code § 631(a).

8.     As discussed in detail below, Defendant utilized Facebook Pixel and other spyware to intercept Plaintiff's and the Class Members' electronic computer-to-computer data communications, including how Plaintiff and Class Members interacted with the website, mouse movements and clicks, keystrokes, search items, information inputted into the website, and pages and content viewed while

CLASS ACTION COMPLAINT

visiting the website. Defendant intentionally tapped and made unauthorized interceptions and connections to Plaintiff and Class Members' electronic communications to read and understand movement on the website, as well as everything Plaintiff and Class Members did on those pages, *e.g.*, what Plaintiff and Class Members searched for, looked at, the information inputted, and items clicked on.

9.  Defendant made these unauthorized interceptions and connections without the knowledge or prior consent of Plaintiff or Class Members.

10. The Facebook Pixel and other spyware utilized by Defendant is sophisticated computer software that allows Defendant to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive Plaintiff's and Class Members' electronic communications.

11. Jonathan Cherki, the CEO of a major spyware company – while discussing the merger of his company with another provider – publicly exposed why companies like Defendant engage in learning the contents of visits to their websites: "The combination of Clicktale and Contentsquare heralds an unprecedented goldmine of digital data that enables companies to interpret and predict the impact of any digital element – including user experience, content, price, reviews and product – on visitor behavior[.]"[1] Mr. Cherki added that, "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customer and partners, we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experience."[2]

12. In sum, Defendant illegally tapped, made an unauthorized connection to, and intercepted Plaintiff's and Class Members' electronic communications through visits to Defendant's website, causing injuries, including violations of Plaintiff's

---

[1] https://www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html
[2] *Id*

and Class Members' substantive legal privacy rights under the Wiretap Act and CIPA.

13.    Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

14.    Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

15.    All violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

16.    Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the named Defendant.

### JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over the Defendant because it has sufficient minimum contacts with this District in that it operates and markets their services throughout the country and in this District.

18.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises out of Defendants' violations of the Wiretap Act, 18 U.S.C. §2510 et seq.

19.    Jurisdiction is also established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a resident of the State of California, seeks relief on behalf of (1) a national class and (2) a California subclass, which will result in at least one Class Member belonging to a different state than Defendant, a Delaware Corporation with its principal place of business in Florence, KY 41042.

20.   Plaintiff is requesting statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510 et seq and $2,500 per violation of Cal. Penal Code §631, which when aggregated among a proposed class number in the hundreds of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

21.   Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

22.   Because Defendant conducts business within the State of California, personal jurisdiction is established.

23.   This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

24.   Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

### PARTIES TO THE LITIGATION

25.   Plaintiff is a San Diego, California resident, Facebook user, and a customer of Defendant's website which was used to communicate confidential information to Defendant. Plaintiff's use of the Defendant's website included the time during which the Facebook Pixel and other spyware was secretly deployed on the website's home and other pages.

26.   Defendant HWAREH.COM, Inc. ("Defendant") is a Delaware corporation headquartered at 7107 Industrial Road Florence, KY 41042 and does business throughout the United States, deriving substantial revenue from interstate commerce.

//

CLASS ACTION COMPLAINT

### DEFENDANT'S USE OF FACEBOOK PIXEL

27.   Plaintiff brings this action on behalf of herself and other Americans whose privacy has been violated by Defendant's use of the Facebook's Pixel tracking tool. As explained herein, Defendant knows (or should have known) that its use of the Facebook Pixel tracking tool is being improperly used on its website resulting in the wrongful, contemporaneous, interception, recording, and re-direction to Facebook of private communications on its website. This unlawful collection of data is done without the knowledge or authorization of the patient, like Plaintiff, in violation of federal and state laws as well as Facebook's own terms with its users.

28.   Unbeknownst to Plaintiff, and millions of other persons around the country, when Plaintiff accessed Defendant's website, the Facebook Pixel secretly deployed on the webpage sent the fact that he has clicked to sign-in to that website to Facebook.

29.   According to Facebook, the kinds of data that the Facebook Pixel causes to be re-directed from the Plaintiff's computing device to Facebook includes:

> We receive activity from businesses and organizations who use our business tools so they can better understand how their website, app or ads are performing. We use your activity to show you relevant ads and to suggest things you might be interested in.
> Examples of interactions include:
> •Opened an app
> •Logged into app with Facebook
> •Visited a website
> •Searched for an item
> •Added an item to a wishlist
> •Added an item to a cart
> •Made a purchase
> •Made a donation

Businesses and organizations can also send custom interactions that meet certain needs. For example, they may use a custom interaction to create a unique group of customers in order to show them relevant ads.

**Sensitive information is prohibited**
We prohibit businesses and organizations from sharing sensitive information with us, including health and financial data. If we determine that a business or an organization is violating our terms, we will take action against that business or organization.

To see what interactions were shared, you can download your activity details.

https://www.facebook.com/off_facebook_activity/

30.  Defendant relayed Plaintiff's information directly to Facebook, surreptitiously and without consent, including the fact that Plaintiff was communicating with Defendant via its website.

31.  Defendant relayed about Plaintiff's activity information to Facebook multiple times in the past year prior to filing this lawsuit without his prior knowledge or consent.

32.  Identifiers that Facebook uses to identify the Plaintiff and his/her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and Browser attribute information sufficient to fingerprint the patient's device.

33.  The same disclosures occurred for persons around the country when they accessed the Defendant's website.

34.  Facebook monetizes the information it receives through the Facebook Pixel deployed on Defendant's Express-Scripts.com website by using it to generate highly-profitable targeted advertising on- and off-Facebook.

35.    The targeted advertising Facebook offers for sale includes the ability to target persons based on specific actions that a person has taken on a website like Defendant's.

36.    The Facebook Pixel data unlawfully shared by Defendant also offers the ability to engage in remarketing based on positive targeting– that is, serving specific ad campaigns to patients based on the specific actions those patients took on the Defendant's website.

37.    Defendant's actions described herein give rise to causes of action for: (1) federal and state electronic communications privacy and wiretap claims; and, (2) the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632.

FACTS SPECIFIC TO DEFENDANT

38.    According to its website, Defendant is a nationwide online pharmacy serving all 50 states including California. https://www.healthwarehouse.com/about-healthwarehouse last accessed March 28, 2023.

39.    Defendant is "America's leader in Digital Pharmacy and a pioneer in affordable healthcare. Based in Florence, Kentucky, the company's services are available nationwide, shipping FDA approved prescription medication, over-the-counter products, and veterinary medication direct to patients' doors. Id.

40.    Defendant is "accredited by the National Association of Board of Pharmacy® (NABP®) for Digital Pharmacy, formerly known as Verified Internet Pharmacy Practice Sites® (VIPPS®), and is Licensed / Accredited with all 50 State Boards of Pharmacy." Id.

41.    Defendant touts. "With our focus on technology and sourcing, we are able to remove layers of cost between the manufacturer and the customer. Our proprietary software allows us to process prescription and over-the-counter products efficiently and cost effectively. We aren't burdened with substantial

9

overhead costs of traditional retail pharmacy chains, nor the requirement to artificially keep prescription drug costs higher in order to maintain insurance reimbursements. Therefore, we are able to keep our costs low, and pass along the savings to our valued customers." Id.

42.   Defendant's HIPAA privacy policy states:

> **Health Insurance Portability & Accountability Act**
> Healthwarehouse.com is committed to protecting your privacy. As a healthcare provider, we know that your trust in us is of central importance. This policy discloses our information use and disclosure of PHI in detail and how you can get access to this information. Please read it to learn more about the ways we protect the information we collect and to find out how you can limit the information about you that is shared. If Healthwarehouse.com should change its information practices, we will provide you notice of any material changes.
>
> **Strict Security Measures**
> Healthwarehouse.com takes the security of information very seriously and has established security standards and procedures to prevent unauthorized access to patient information. We maintain physical, electronic, and procedural safeguards to comply with federal standards to guard patient information.

43.   Defendant's Privacy Policy states:

> **Privacy Policy**
> Your privacy is very important to us. Accordingly, we have developed this Policy in order for you to understand how we collect, use, communicate and disclose and make use of personal information. The following outlines our privacy policy.
>
> - Before or at the time of collecting personal information, we will identify the purposes for which information is being collected.
> - We will collect and use of personal information solely with the objective of fulfilling those purposes specified by us and for other compatible purposes, unless we obtain the consent of the individual concerned or as required by law.

- We will only retain personal information as long as necessary for the fulfillment of those purposes.
- We will collect personal information by lawful and fair means and, where appropriate, with the knowledge or consent of the individual concerned.
- Personal data should be relevant to the purposes for which it is to be used, and, to the extent necessary for those purposes, should be accurate, complete, and up-to-date.
- We will protect personal information by reasonable security safeguards against loss or theft, as well as unauthorized access, disclosure, copying, use or modification.
- We will make readily available to customers information about our policies and practices relating to the management of personal information.

We are committed to conducting our business in accordance with these principles in order to ensure that the confidentiality of personal information is protected and maintained.

https://www.healthwarehouse.com/privacy-policy last accessed March 28, 2023.

### HOW FACEBOOK PIXEL WORKS

44. Facebook operates the world's largest social media company.

45. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

46. Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

47. Facebook's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

48. Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

49. The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for … ad campaigns." https://www.facebook.com/business/learn/facebook-ads-pixel.

50. The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers like Defendant to help track ad-driven activity from Facebook and others on their website.

51. Key features of the Facebook Pixel include its ability to help developers like Defendant to:

   a. "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

   b. "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

   c. "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."

52. Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."

53. Facebook further explains "How the Facebook Pixel Works." https://www.facebook.com/business/learn/facebook-ads-pixel.

CLASS ACTION COMPLAINT

54. Facebook provides simple instructions for developers like the Defendant to set up the Facebook Pixel.

55. Facebook creates the Facebook code for each developer who installs it.

56. Facebook recommends that the Pixel code be placed early in the source code for any given webpage or website to ensure that the user will be tracked.

57. By executing the code immediately, Facebook has designed the Pixel such that Facebook receives the information about customer actions on the Defendant's website properties contemporaneous with their making.

58. As soon as a patient takes any action on a webpage that includes the Facebook Pixel—such as clicking a button to register, login, or logout of a customer portal—Facebook's source code commands the customer's computing device to re-direct the content of the customer's communication to Facebook while the exchange of the communication between the customer and the Defendant is still occurring.

59. The Facebook Pixel code selected by Defendant and deployed on its website begins transmitting customer interactions, actions, inputs, selection, mouse clicks, mouse hovers, mouse movements, and/or keyboard inputs instantly in the first milliseconds that a customer accesses the Defendant's website.

60. Defendant has engineered and coded its website such that no human being could possibly, find, observe, and select--let alone read--the website's terms of use or privacy policy and either be made aware of or consent to such interception designed by Defendant.

61. From the instant a customer accesses Defendant's website, Defendant is flooding Facebook with information about that customer's visit, providing

13

Facebook with detailed information about IP addresses, page views, button clicks, and other microdata personally identifiable to the customer.

62.  By Defendant's design, Facebook receives the content of a customer's portal sign-in communication immediately after the customer clicks the log-in button and even before the Defendant receives it.

63.  The content of the customer's communications with Defendant are re-directed to Facebook while the communications are still occurring.

64.  The cookies that Facebook identifies patients with include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

65.  The c_user cookie is a means of identification for Facebook users that Defendant employs on its website. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

66.  A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

67.  It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier.

CLASS ACTION COMPLAINT

68. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. The Facebook datr cookie identifies the person's specific web browser from which the person is sending the communication. It is an identifier that is unique to the person's specific web browser and is therefore a means of identification for Facebook users.

70. Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

71. Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

72. Facebook expressly admits that the Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase."

73. The Facebook fr cookie is an encrypted combination of the c_user and datr cookies. *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

74. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a website that has deployed Pixel and Facebook.

https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

75.    In order to deploy the Pixel software, website developers like the Defendant simply copy-paste the Facebook Pixel code that Facebook creates and provides into their web page.

## FACTS SPECIFIC TO PLAINTIFF AND CLASS MEMBERS

76.    Defendant maintains a website called Healthwarehouse.com ("website").

77.    Over the last few years, Plaintiff and Class Members visited Defendant's website.

78.    Plaintiff was in San Diego, California during Plaintiff's visits to Defendant's website.

79.    Plaintiff accessed Defendant's website via a personal computer using hardwired internet access.

80.    Unbeknownst to Plaintiff, Defendant deployed the Facebook Pixel software on its website.

81.    Using Pixel, Defendant's website thereafter surreptitiously intercepted and transmitted in real time to Facebook, without Plaintiff's prior knowledge or consent, a variety of private communications between Plaintiff and Defendant.

82.    These private communications included items such as page views, button clicks, names of buttons clicks, microdata, mouse clicks, mouse hovers, scrolling, and other observable website interactions, selections, and communications.

83.    During visits to the website, Plaintiff and Class Members, through computers and/or mobile devices, transmitted electronic communications in the form of instructions to Defendant's computer servers utilized to operate the website. The commands were sent as messages indicating to Defendant what content was being viewed, clicked on, requested and/or inputted by Plaintiff and Class

16

Members. The communications sent by Plaintiff and Class Members to Defendant's servers included, but were not limited to, the following actions taken by Plaintiff and Class Members while on Defendant's website: mouse clicks and movements, keystrokes, search items, information inputted by Plaintiff and Class Members, pages and content viewed by Plaintiff and Class Members, scroll movements, and copy and paste actions.

84. Defendant responded to Plaintiff's and Class Members' electronic communications by supplying – through its website – the information requested by Plaintiff and Class Members. *Revitch v. New Moosejaw, LLC,* U.S. Dist. LEXIS 186955, at *3 (N.D. Cal. 2019) ("This series of requests and responses – whether online or over the phone – is communication.").

85. Plaintiff and Class Members reasonably expected that visits to Defendant's website would be private, and that Defendant would not be intercepting or tapping their communications with Defendant's website, particularly because Defendant failed to present Plaintiff and Class Members with a pop-up disclosure or consent form alerting Plaintiff that the visits to the website were monitored and recorded by Defendant.

86. Plaintiff and Class Members reasonably believed their interactions with Defendant's website were private and would not be recorded or monitored for a later playback by Defendant, or worse yet, monitored live while Plaintiff and Class Members were on its website.

87. Upon information and belief, over the last few years, Defendant has had embedded within its website code and has continuously operated Facebook Pixel spyware.

88. The Facebook Pixel spyware used by Defendant is not a provider of wire or electronic communication services, or an internet service provider.

89. The Facebook Pixel spyware was not instrumental or necessary to the operation or function of Defendant's website or business.

17

90. Defendant's use of the Facebook Pixel spyware to intercept Plaintiff's electronic communications was not instrumental or necessary to Defendant's provision of any of its goods or services. Rather, the level and detail of information surreptitiously collected by Defendant indicates that the only purpose was to gain an unlawful understanding of the habits and preferences of users to its websites, and the information collected was solely for Defendant's own benefit.

91. Defendant's use of the Facebook Pixel spyware to intercept Plaintiff's and Class Members' electronic communications did not facilitate, was not instrumental, and was not incidental to the transmission of Plaintiff's and Class Members' electronic communications with Defendant's website.

92. During one or more of Plaintiff's and Class Members' visits to Defendant's website, Defendant utilized the Facebook Pixel spyware to intercept the substance of Plaintiff's and Class Members' electronic communications intentionally and contemporaneously with Defendant's website, including mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, pages and content viewed, scroll movements, and copy and paste actions. In other words, Defendant tapped and made unauthorized connections to the electronic communications of Plaintiff and Class Members made during visits to Defendant's website.

93. The relevant facts regarding the full parameters of the communications Defendant intercepted and the extent of how the connections occurred are solely within the possession and control of Defendant.

94. The Facebook Pixel spyware utilized by Defendant is not a website cookie, standard analytics tool, web beacon, or other similar technology.

95. Unlike harmless collection of an internet protocol address, the data collected by Defendant identified specific information inputted and content viewed and thereafter transmitted the same to Facebook for its aggregation, use, and sale to

CLASS ACTION COMPLAINT

drive advertising, and thus revealed personalized and sensitive information about Plaintiff's and Class Member's internet activity and habits.

96.    The electronic communications Defendant intentionally intercepted were content generated through Plaintiff's use, interaction, and communication with Defendant's website relating to the substance, purport, and/or meaning of Plaintiff's and Class Members' communications with the website.

97.    The electronic communications Defendant intercepted were not generated automatically and were not incidental to other consumer communications.

98.    The Facebook Pixel spyware utilized by Defendant intercepted, tapped, and made unauthorized connections, which allowed Defendant to learn the contents of communications of Plaintiff and Class Members in a manner that was undetectable to them.

99.    Defendant then stored the communications and transmitted them in real time to Facebook for its business purposes.

100.   Defendant never sought consent and Plaintiff and Class Members never provided consent for Defendant's unauthorized access to their electronic communications.

101.   Plaintiff and Class Members did not have a reasonable opportunity to discover Defendant's unlawful and unauthorized connections because Defendant did not disclose its actions or seek consent from Plaintiff or Class Members prior to making the connections to the electronic communications through the Facebook Pixel spyware.

### FACEBOOK PIXEL EAVESDROPPING ON DEFENDANT'S WEBSITE

102.   In this investigation, Plaintiff, using publicly available software, Plaintiff has been able to analyze the web traffic between a computer and a website with which it is interacting.

103.   This software monitors and records all inbound and outbound data requests made by a website in a user's browser.

19

104. Testing was done between a standard Google Chrome Browser and Defendant's website with this software running in the background.

105. In examining the technical aspects of the Facebook software's use of "GET" requests, the 9th Circuit observed:

> The party exception must be considered in the technical context of this case. When an individual internet user visits a web page, his or her browser sends a message called a "GET request" to the web page's server. The GET request serves two purposes: it first tells the website what information is being requested and then instructs the website to send the information back to the user. The GET request also transmits a referer header containing the personally- identifiable URL information. Typically, this communication occurs only between the user's web browser and the third- party website. On websites with Facebook plug-ins, however, Facebook's code directs the user's browser to copy the referer header from the GET request and then send a separate but identical GET request and its associated referer header to Facebook's server. It is through this duplication and collection of GET requests that Facebook compiles users' browsing histories.
>
> …
>
> **We adopt the First and Seventh Circuits' understanding that simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception.** As we have previously held, the "paramount objective of the [Electronic Communications Privacy Act, which amended the Wiretap Act] is to protect effectively the privacy of communications." *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013). We also recognize that the Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or "an unseen auditor." *See* S. REP. NO. 90-1097, *reprinted in* 1986 U.S.C.C.A.N. 2112, 2154, 2182. **Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule.**

> Therefore, we conclude that Facebook is not exempt from liability as a matter of law under the Wiretap Act or CIPA as a party to the communication.

106.   During these tests, this software reported that Defendant's website affirmatively interacted in the background with Facebook servers at least 4 times, 4 of which were connections to Facebook Servers and were "GET" and "POST" requests from Facebook Servers.

107.   On information and belief, Defendant's website repeatedly and continuously communicates private data to Facebook about Plaintiff and the Class Members during its signup process, including the name of the person signing up, date of birth, zip code, button text clicked, IP address, exact URL referred, and other personally identifiable information.

108.   The 9th Circuit has held that "These terms and the resulting URLs could divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's platform." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 605 (2020).

109.   Defendant's instantaneous capture of this information from Plaintiff and the Class Members' information, and its interception and transmission to Facebook by Pixel occurs simultaneously without the user's knowledge or awareness.

110.   Defendant's aiding and abetting of Facebook's eavesdropping on Plaintiff's and the Class Members' private communications with Defendant's website happens well before the user of the website is ever presented any clickable links to a privacy policy or terms of service.

### OTHER SPYWARE DEPLOYED ON DEFENDANT'S WEBSITE

111.   In addition to Facebook Pixel, Defendant has deployed numerous other spyware software devices on its website that contemporaneously and surreptitiously intercept Plaintiff and the other Class Members' realtime communications and immediately transmit them in real time to these third-party spyware companies.

112.   During testing, the testing software showed that Defendant's website instantaneously captured sensitive medical search information and specific website page visits from Plaintiff and thereafter transmitted that sensitive medical information simultaneously, without the user's knowledge or awareness, to each of these third-party spyware companies.

113.   For example, testing by Plaintiff's counsel showed that when a user types in sensitive medical information searches on the Defendant's website such as "condom", "Plan B Pill", "Viagra" or "adult diapers" these search terms were immediately transmitted to many of these third-party spyware companies along with various other data designed to specifically identity Plaintiff and the other Class Members.

114.   The spyware deployed by Defendant on its website shares the personal medical information of users by means of "browser fingerprinting"[3] and other techniques to match sensitive personal medical information with specific persons.

---

[3] **What is browser fingerprinting?**

Browser fingerprinting (also called device fingerprinting or online fingerprinting) refers to tracking techniques that websites use to collect information about you. Modern website functions require the use of scripts — sets of instructions that tell your browser what to do. Working silently in the background, scripts can identify lots of information about your device and browser that, when stitched together, forms your unique online "fingerprint." This fingerprint can then be traced back to you across the internet and different browsing sessions.

What exactly can scripts find out? They can determine a lot about the device you're using, such as its operating system, your browser, the software installed on your device, what timezone you're in, which language you're reading in, whether you use an ad blocker, your screen's resolution and color depth, all the browser extensions you've installed, and even more granular technical specifications about your graphics card, drivers, and more.

Imagine you want to identify a person in a crowd: you can do so by listing their attributes and other defining features. For example, you could describe someone as a woman with long blond hair, a red shirt with a white collar, a grey skirt, black shoes, red lipstick, etc. With enough attributes, it's easy to identify this woman, even in a crowd of other people.

Browser fingerprinting provides enough specific attributes about your device and its settings that you can be reliably identified out of a crowd of internet users.

22

115.  Defendant deployed the following spyware on its website and/or communicated Plaintiff's and the other Class Members information with these third-parties on the following company websites, which received intercepted data and communications, including sensitive medical search terms via GET, POST, Query, Javascript, and other means ("spyware companies")

116.  **https://www.google-analytics.com** - a web analytics service that provides statistics and basic analytical tools for search engine optimization (SEO) and marketing purposes.

117.  **https://stats.g.doubleclick.net** - an additional script that collects specific demographic information about your visitors.

118.  **https://app.launchdarkly.com** - a code development and deployment testing app.

119.  **https://healthwarehouse.attn.tv** - a personalized mobile messaging platform that helps retail & e-commerce brands acquire, retain, and interact with mobile shoppers.

120.  **https://medchatapp.com** - software to allow businesses to use two-way text messaging functionality to converse with patients.

121.  **https://dc.services.visualstudio.com** - an integrated development environment from Microsoft. It is used to develop computer programs, as well as websites, web apps, web services and mobile apps.

122.  **https://play.google.com** - an online store where people go to find their favorite apps, games, movies, TV shows, books, and more.

123.  **https://gum.criteo.com** - an advertising service that website publishers can use to generate revenue on their sites.

---

Similarly, browser fingerprinting provides enough specific attributes about your device and its settings that you can be reliably identified out of a crowd, even the extremely large crowd of millions of internet users and billions of devices. In fact, device fingerprinting can identify users with 90 to 99% accuracy.

https://www.avast.com/c-what-is-browser-fingerprinting last accessed March 28, 2023.

CLASS ACTION COMPLAINT

124.    **https://bam.nr-data.net** - the reporting domain for New Relic Browser which can monitor a variety of details about everything from page load timing to time spent in the front end, time spent in the back end, geography, and browser type. To collect the data, uses JavaScript elements pasted or injected into webpages containing configuration details and essential browser environment instrumentation. Once the page finishes loading, an additional script is downloaded from a CDN server which processes collected data and reports it back to this site.

125.    **https://beacon.deepintent.com** - healthcare advertising platform that empowers marketers to plan, activate, measure, and optimize HCP and patient programmatic campaigns, all within a single platform.

126.    **https://z.moatads.com** - a bogus website, used by hackers to redirect traffic to sponsor links or sponsor ads or to promote fake remote support services. It generates pop-ups, ads and banners via a malicious browser extension (browser add-on), which is a part of an adware.

127.    **https://www.googletagmanager.com** - add on software with the ability to add and update your own tags for conversion tracking, site analytics, remarketing, and more.

128.    **https://dev.visualwebsiteoptimizer.com** - software used to increase conversions across the entire customer journey by providing one integrated platform to understand visitor behavior, run experiments, personalize experiences and re-engage them.

129.    **https://secure.quantserve.com** - creates web beacons and cookies operated by audience research and behavioral advertising company Quantcast.

130.    **https://www.googleadservices.com** -  a domain is associated with the Google Marketing application.

131.    **https://v1.addthisedge.com** - a social bookmarking service that can be integrated into a website with the use of a web widget. Once the widget is added,

visitors to the website can bookmark or share an item using a variety of services, such as Facebook, Pinterest, and Twitter and it collects users' behavioral data, even if they do not share anything.

132. **https://m.addthis.com** - the world's largest content sharing platform that provides tools that make it easier share content across the social web and provides publishers with increased traffic and in-depth analytics. It provides publishers with a small amount of HTML and Javascript code that displays sharing tools on pages and captures information about their usage.

133. **https://rules.quantcount.com** - software that specializes in audience measurement and real-time advertising.

134. **https://static.criteo.net** - an advertising company that provides online display advertisements.

135. **https://bat.bing.com** - a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft and works directly with Bing Ads UET script. When a search user clicks on their Bing-powered ad and navigates to the advertiser's web page, the script sends a beacon/signal to the Bat. Bing servers.

136. **https://ib.adnxs.com** - Technology that can plug into other advertising serving platforms, such as Google's Doubleclick, and "data aggregators", such as Quantcast, which provide behavioral targeting making its software an "advertising exchange for advertising exchange".

137. **https://connect.facebook.net** - software that allows users to "connect" their Facebook identity, friends, and privacy to any site.

138. **https://cdn.attn.tv** - creates and manages interactions through personalized text messaging.

139. **https://secure.quantserve.com** - creates web beacons and cookies operated by audience research and behavioral advertising company Quantcast.

140. **https://dx.steelhousemedia.com** - tracker that provides advertising or advertising-related services such as data collection, behavioral analysis, or retargeting.

141. **https://js-agent.newrelic.com** - tracker that collects and analyzes data related to site usage and performance.

142. **https://sslwidget.criteo.com** - tracker that provides advertising or advertising-related services such as data collection, behavioral analysis, or retargeting.

143. **https://prreqcroab.icu** - The domain name is not a secure website and visitors are frequently redirected to other suspicious sites without their consent.

144. **https://events.attentivemobile.com** - a personalized mobile messaging platform that helps retail & e-commerce brands acquire, retain, and interact with mobile shoppers.

145. Defendant's aiding and abetting of eavesdropping on Plaintiff's and the Class Members' private communications with Defendant's website without the user of the website is ever presented any clickable links to a privacy policy or terms of service.

<strong>S<small>TANDING</small></strong>

146. Defendant's conduct constituted invasions of privacy because it disregarded Plaintiff's statutorily protected rights to privacy, in violation of the Wiretap Act and CIPA. *See Rendon v. Cherry Creek Mortgage, LLC*, 2022 WL 17824003 (S.D. Cal. 2022).

147. Defendant caused Plaintiff to (1) suffer invasions of legally protected interests. (2) The invasions were concrete because the injuries actually existed for Plaintiff and continue to exist every time Plaintiff visits Defendant's website. The privacy invasions suffered by Plaintiff and Class Members were real and not abstract. Plaintiff and Class Members have a statutory right to be free from interceptions of their communications. The interceptions Defendant performed were meant to secretly spy on Plaintiff to learn more about Plaintiff's behavior. Plaintiff and

Class Members were completely unaware they were being observed. Plaintiffs' injuries were not divorced from concrete harm in that privacy has long been protected in the form of trespassing laws and the Fourth Amendment of the U.S. Constitution for example. Like here, an unreasonable search may not cause actual physical injury, but is considered serious harm, nonetheless. (3) The injuries here were particularized because they affected Plaintiff in personal and individual ways. The injuries were individualized rather than collective since Plaintiff's unique communications were examined without consent during different website visits on separate occasions. (4) Defendant's past invasions were actual and future invasions are imminent and will occur next time Plaintiff visits Defendant's website. Defendant continues to intercept communications without consent. A favorable decision by this court would redress the injuries of Plaintiff and each Class.

## HIPAA ALLEGATIONS

148. Patient health care information in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations promulgated by the United States Department of Health and Human Services ("HHS").

149. The HIPAA Privacy Rule establishes "national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as "protected health information") and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization. The Rule also gives individuals rights

over their protected health information, including rights to examine and obtain a copy of their health records, to direct a covered entity to transmit to a third party an electronic copy of their protected health information in an electronic health record, and to request corrections. The Privacy Rule is located at 45 CFR Part 160 and Subparts A and E of Part 164."

https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

150. Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

151. Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

152. Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

153. Under 45 C.F.R. § 164.514, the HIPAA de-identification rule states that "health information is not individually identifiable only if" (1) an expert "determines

that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed: Names … Medical record numbers; … Account numbers … Device identifiers and serial numbers; … Web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; … and any other unique identifying number, characteristic, or code." In addition, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

154.    Under 42 U.S.C. § 1320d-6, any "person [individual … or a corporation] who knowingly and in violation of this part—(1) uses or causes to be used a unique health identifiers; [or] (2) obtains individually identifiable health information relating to an individual … shall be punished" by fine or, in certain circumstances, imprisonment, with increased penalties for "intent to sell, transfer, or use individually identifiable health information for commercial advantage[.]" The statute further provides that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization."

155.    Patient status alone is protected by HIPAA.

156.  Guidance from HHS instructs health care providers that patient status is protected by HIPAA. In <u>Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule</u>, HHS sets out:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … *If such information was listed with* health condition, *health care provision* or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI.

> https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf at 5 (emphasis added).

157.  HHS specifically identifies birthdates as Personal Health Information that must not be disclosed improperly: "Protected health information includes many common identifiers (e.g., name, address, birth date, Social Security Number) when they can be associated with the health information listed above." Id. at 4.

158.  In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*.[2]

https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (emphasis added).

159. HHS has previously instructed that HIPAA covers patient-status alone:

   a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

   b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

   c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

   d. The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

160. There is no HIPAA-exception for the Internet or online patient portals.

161. Defendant did not procure HIPAA authorizations from the Plaintiff or other members of the class for the disclosure of patient status and health information to Facebook.

162. When a patient communicates with a health care provider's website where the Facebook Pixel is present on the patient portal login page, the Facebook Pixel

source code causes the exact content of the patient's communication with their health care provider to be re-directed to Facebook in a fashion that identifies them as a patient, as does the other spyware companies software deployed by Defendant on its website

163. Facebook has publicly acknowledged that targeted advertising based on health information is not appropriate.

164. For medical providers, the actions that the Facebook Pixel logs include:

a. When a patient clicks to register for the patient portal;

b. When a patient clicks to log-in to the patient portal;

c. When a patient clicks to logout of the patient portal;

d. When a patient sets up an appointment;

e. When a patient clicks a button to call the provider; and

f. The specific communications a patient exchanges at the provider's property, including those relating to specific providers, conditions, and treatments and the timing of such actions, including whether they are made while a patient is still logged-in to a patient portal or around the same time that the patient has scheduled an appointment, called the medical provider, or logged in or out of the patient portal.

165. On November 9, 2021, Facebook announced that it was removing the ability to target users on "topics people may perceive as sensitive, such as options referencing causes, organizations, or public figures that relate to health[.]" https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expandingour-ad-controls.

166. Facebook's announcement was a public relations success:

a. Reuters published a story headlined "Facebook plans to remove thousands of sensitive ad-targeting options" and lead the story with a sentence about Facebook's "plans to remove detailed ad-targeting options that refer to 'sensitive' topics, such as ads based on interactions with content around …health[.]"

https://www.reuters.com/technology/facebook-removes-target-options-advertisers-some-topics-2021-11-09/.

b. The New York Times published a similar story with a similar headline, "Meta plans to remove thousands of sensitive ad-targeting categories: Ad buyers will no long be able to use topics such as health … to target people[.]" https://www.nytimes.com/2021/11/09/technology/meta-facebook-ad-targeting.html.

c. Many more, similar, articles were published, giving Facebook's users the misimpression that Facebook would not allow targeting based on health.

167. But Facebook did not change the most insidious types of targeting based on health: those marketing campaigns from medical providers that disclose patient identities and their individually identifiable health information to Facebook for the purpose of targeted marketing based on their communications with their medical providers.

168. Facebook clarified that the change was limited to "people's interactions with content" on the Facebook "platform."

169. Facebook then informed advertisers that they could still use "website custom audiences and lookalike" to "help reach people who have already engaged with a business or group's website or products." In the case of medical providers, the "people who have already engaged" are patients.

## CLASS ACTION ALLEGATIONS

170. Plaintiff brings this lawsuit as a class action on behalf of Plaintiff and Class Members of a proposed Class and Subclass under Fed.R.Civ.P. 23.

171.    Plaintiff proposes the following Class and Subclass, consisting of and defined as follows:

> <u>Class</u>
> All persons in the United States whose communications were intercepted by Defendant or its agents.

> <u>Subclass</u>
> All persons in California whose communications were intercepted by Defendant or its agents.

172.    Excluded from each Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine each Class and to add subclasses as appropriate based on discovery and specific theories of liability.

173.    **<u>Numerosity</u>**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of each Class is currently unknown to Plaintiff at this time; however, given that, on information and belief, Defendant accessed millions of unique computers and mobile devices, it is reasonable to presume that the members of each Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

174.    **<u>Commonality</u>**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

- Whether Defendant intercepted any communications with Class Members;

- Whether Defendant had, and continues to have, a policy during the relevant period of intercepting digital communications of Class

Members;

- Whether Defendant's policy or practice of intercepting Class Members digital communications constitutes a violation of 18 U.S.C. § 2520;

- Whether Defendant's policy or practice of intercepting Class Members digital communications constitutes a violation of Cal. Penal Code § 631;

- Whether Plaintiff and Class Members were aware of Defendant's spyware on its website and had consented to its use.

175. **Typicality**: Plaintiff's and Class Members' electronic communications were intercepted, unlawfully tapped and recorded without consent or a warning of such interception and recording, and thus, the injuries are also typical to Class Members.

176. Plaintiff and Class Members were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through its agents, illegally intercepted, tapped, recorded, and stored Plaintiff and Class Members' electronic communications, and other sensitive personal data from their digital devices with others, and Defendant invading the privacy of Plaintiff and Class Members. Plaintiff and Class Members were damaged thereby.

177. **Adequacy**: Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom Plaintiff is similarly situated, as demonstrated herein. Plaintiff acknowledges that Plaintiff has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are well versed in the rules governing class action discovery, certification, and settlement. In addition, Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. The proposed class counsel is experienced in handling claims involving consumer actions and

violations of the Wiretap Act and California Penal Code § 631. Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member. Plaintiff and proposed class counsel are ready and prepared for that burden.

178. **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of each Class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to each Class rather than individual to its members.

179. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

A.   Class-wide damages are essential to induce Defendant to comply with Federal and California law.

B.   Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

C.   Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

D.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

E.   Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

F.   Absent a class action, Class Members will continue to incur

36

1   damages, and Defendant's misconduct will continue without

2   remedy.

3   180.  Plaintiff and the Class Members have suffered, and will continue to suffer, harm

4   and damages as a result of Defendant's unlawful and wrongful conduct.  A class

5   action is superior to other available methods because as individual Class

6   Members have no way of discovering that Defendant intercepted and recorded

7   the Class Member's electronic communications without Class Members'

8   knowledge or consent.

9   181.  Each Class may also be certified because:

10  • The prosecution of separate actions by individual Class Members

11  would create a risk of inconsistent or varying adjudication with

12  respect to individual Class Members, which would establish

13  incompatible standards of conduct for Defendant;

14  • The prosecution of separate actions by individual Class Members

15  would create a risk of adjudications with respect to them that

16  would, as a practical matter, be dispositive of the interests of other

17  Class Members not parties to the adjudications, or substantially

18  impair or impede their ability to protect their interests; and

19  • Defendant has acted, or refused to act, on grounds generally

20  applicable to each Class, thereby making appropriate final and

21  injunctive relief with respect to the members of each Class as a

22  whole.

23  182.  This suit seeks only damages and injunctive relief for recovery of economic

24  injury on behalf of Class Members and it expressly is not intended to request any

25  recovery for personal injury and claims related thereto.

26  183.  The joinder of Class Members is impractical and the disposition of their claims

27  in the Class action will provide substantial benefits both to the parties and to the

28  court.  The Class Members can be identified through Defendant's records.

CLASS ACTION COMPLAINT

**TOLLING**

184.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

185.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendant were material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

186.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true nature of the disclosures being made and the lack of an actual "requirement" before the data was shared with it.

187.   Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's concealment.

188.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

//

//

## FIRST CAUSE OF ACTION

## VIOLATION OF THE WIRETAP ACT

## 18 U.S.C. § 2510 ET SEQ.

189. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

190. The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986, prohibits the intentional interception of any wire, oral, or electronic communication.

191. Under 18 U.S.C. § 2520(a) there is a private right of action to any person whose wire, oral, or electronic communication is intercepted.

192. Defendant intercepted Plaintiff's and Class Members' electronic communications without consent when Plaintiff and Class Members navigated through Defendant's website.

193. Plaintiff and Class Members were unaware Defendant was intercepting their electronic communications and tracking their communications and interactions with Defendant's website.

194. Defendant intentionally utilized technology – the Facebook Pixel and other spyware on its website – as a means of intercepting and acquiring the contents of Plaintiff's and Class Members' electronic communications, in violation of 18 U.S.C. § 2511.

195. Plaintiff and Class Members are persons whose electronic communications were intercepted by Defendant.  As such, they are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each violation, actual damages, punitive damages, and reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

//

//

//

**SECOND CAUSE OF ACTION**

**UNLAWFUL WIRETAPPING AND INTERCEPTION OF ELECTRONIC COMMUNICATION**

**CALIFORNIA PENAL CODE § 631**

196. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

197. Defendant aided and abetted the interception of components of Plaintiff's and Class Members' private electronic communications and transmissions by a third-party, Facebook and the other spyware companies, when Plaintiff and other Class Members accessed Defendant's website from within the State of California.

198. Plaintiff and Class Members did not know Defendant was engaging in such interception by a third-party and therefore could not provide consent to have any part of their private electronic communications intercepted with the aiding and abetting of the Defendant.

199. Plaintiff and Class Members were completely unaware that Defendant had assisted third-parties, Facebook and the other spyware companies, to intercept and store electronic communications and other personal data until well after it had already occurred and were therefore unable to consent.

200. Defendant never advised Plaintiff or the other Class Members that any part of this communications or their use of Defendant's website would be tapped and thereafter delivered to these third-parties.

201. To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner" does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

202.  Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 2020 WL 1807978 (9th Cir. Apr. 9, 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

203.  The California Supreme Court has held that "Section 631 was aimed at one aspect of the privacy problem—eavesdropping, or the secret monitoring of conversations by third parties." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985) (citation omitted).

204. "California courts interpret 'eavesdrop,' . . . to refer to a third party secretly listening to a conversation between two other parties." *Thomasson v. GC Servs. Ltd. P'ship,* 321 F. App'x 557, 559 (9th Cir. 2008).

205. Defendant's use of the Facebook Pixel and the other spyware is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here, namely, aiding and abetting the secret interception of private communications by Facebook and the other spyware companies, which was eavesdropping by a third-party.

206. As third-party software vendors, Facebook and the other spyware companies were not merely recording these secret communications between Plaintiff and the Class Members and Defendant for Defendant's later review and use.

207. Rather, Facebook and the other spyware companies were aided and abetted in its eavesdropping by Defendant's knowing use of the Facebook Pixel and other spyware which was harvesting private communications and data for their own profit.

208. Facebook and the other spyware companies were surreptitious third-party eavesdroppers who was aided and abetted by Defendant in intercepting these private communications for their own use to target advertising and marketing products, and for other purposes, because they intercepted and used the data itself.

209. "Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 608.

210. By using the Facebook Pixel and other spyware to track, record, and attempt to learn the contents of Plaintiff's and Class Members' electronic communications, Defendant aided and abetted third-parties, Facebook and these other spyware

companies, in intentionally tapping, electrically or otherwise, the lines of internet communication of Plaintiff and Class Members and eavesdropping on them.

211.  By utilizing the Facebook Pixel and other spyware, Defendant aided and abetted a third-party to willfully and without consent, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative Class Members, while the electronic communications were in transit or passing over a wire, line or cable or were being sent from or received at a place in California to permit Facebook and these other spyware companies to eavesdrop on these private communications.

212.  Plaintiff and Class Members did not consent to any of Defendant's actions in aiding and abetting these unauthorized eavesdropping connections by Facebook and the other spyware companies, nor have Plaintiff or Class Members consented to Defendant's aiding and abetting of their intentional access, interception, reading, learning, recording, eavesdropping, and collection of Plaintiff's and Class Members' electronic communications.

213.  Plaintiff's and the Class Members' devices to which Defendant aided and abetted access to by a third-party through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

214.  Defendant violated Cal. Penal Code § 631 by aiding and abetting these  third-parties, Facebook and the other spyware companies, in knowingly eavesdropping on and accessing, without permission, Plaintiff's and Class Members' electronic communications through the use of the Facebook Pixel and other spyware in order for them to track, understand, and attempt to learn the contents of Plaintiff's and Class Members' electronic communications generated by the use of Defendant's website.

215.  Defendant violated Cal. Penal Code § 631 by knowingly and without permission aiding and abetting in the interception, eavesdropping, wiretapping, accessing,

CLASS ACTION COMPLAINT

taking, and using Plaintiff's and the Class Members' communications by the third-party.

216. Plaintiff and Class Members seek relief available under Cal. Penal Code § 631, including $2,500 per violation against Defendant for such aiding and abetting of eavesdropping by a third-party.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE § 56, ET SEQ.**

**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

217. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

218. Defendant is a provider of healthcare within the meaning of Civil Code § 56.06(a) and maintain medical information as defined by Civil Code § 56.05.

219. Plaintiff and the members of the California Subclass are patients of Defendant, as defined in Civil Code § 56.05(k).

220. Defendant maintains personal medical information of Plaintiff and the California Subclass.

221. Defendant negligently created, maintained, preserved, stored, and then exposed Plaintiff's and the California Subclass's individual identifiable "medical information," within the meaning of Civil Code § 56.05(j), including treatment information.

222. Defendants negligently created, maintained, preserved, stored, and released Plaintiff's and the California Subclass's medical information in violation of Civil Code section 56.101, subd. (a).

223. As a result of this negligence, Plaintiff's and the California Subclass's medical information was viewed by unauthorized third parties, namely, Facebook.

224. Because Civil Code § 56.101 allows for the remedies and penalties provided under Civil Code § 56.36(b), Plaintiff, individually and for each member of the

44

California Subclass, seeks nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2) and damages provided by the common law.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**

**CAL. CIV. CODE § 1798.100, ET SEQ.**

**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

225. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

226. Plaintiff and the California Subclass Members are "consumer[s]" as that term is defined in Cal. Civ. Code § 1798.140(g).

227. Defendant is a "business" as that term is defined in Cal. Civ. Code. § 1798.140(c).

228. Defendant collects consumers' (including Plaintiff's and California Subclass Members') personal information and determine the purposes and means of the processing of this personal information (e.g., they design the systems that process and store consumers' personal information).

229. Defendants annually receive for commercial purposes or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers.

230. Plaintiff and California Subclass Members' PII is "nonencrypted and nonredacted personal information" as that term is used in Cal. Civ. Code § 1798.150(a)(1).

231. At a minimum, this PII included the individual's first name or first initial and last name, in combination with dates of birth, addressing, and other unique identification numbers.

232.   The Defendant's misuse of and provision of this PII to Facebook, as more fully described herein, constitutes "an unauthorized access and exfiltration, theft, or disclosure" pursuant to Cal. Civ. Code § 1798.150(a)(1).

233.   Under the CCPA, Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the Plaintiff's and California Subclass Members' PII to protect said PII.

234.   Defendants breached the duty it owed to Plaintiff and California Subclass Members by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and California Subclass Members; (b) prevent the unauthorized dissemination of PII to third parties such as Facebook and the other spyware companies; and (c) maintain security and privacy systems consistent with industry standards.

235.   Defendant's breach of the duty that it owed to Plaintiff and California Subclass Members described above was the direct and proximate cause of the unauthorized dissemination of their medial information. As a result, Plaintiff and California Subclass Members have suffered damages, as described above and as will be proven at trial.

236.   Plaintiff seeks injunctive relief in the form of an order enjoining Defendants from continuing the practices that constituted its breach of the duty owed to Plaintiff and California Subclass Members as described above.

237.   Plaintiff also seeks actual damages, and all other forms of relief available under the CCPA.

238.   Plaintiff and the Class members reserve the right to amend this Complaint as of right to seek statutory damages and relief following the expiration of the 30-day period.

//

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class Members pray that judgment be entered against Defendant, and Plaintiff and Class Members be awarded damages from Defendant, as follows:

- Certify the Class and Subclass as requested herein;
- Appoint Plaintiff to serve as the Class Representative for the Class and Subclass;
- Appoint Plaintiff's Counsel as Class Counsel in this matter;
- Preliminary and other equitable or declaratory relief as may be appropriate under 18 U.S.C. § 2520(b)(1);
- The greater of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510 et seq pursuant to 18 U.S.C. § 2520(b)(2) and 18 U.S.C. § 2520(c)(2)(B);
- Reasonable attorneys' fees and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2520(b)(3);
- $5,000 to each Subclass Member pursuant to California Penal Code § 631(a).
- Reasonable attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5;
- Injunctive relief to prevent the further violations of California Penal Code § 631.
- An order enjoining Defendants from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of Plaintiff's and Class Members' Sensitive Information;
- An award of compensatory and statutory damages, in an amount to be determined;
- An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;
- An award of costs to Plaintiff; and
- Any other relief the Court may deem just and proper including interest.

//
//
//

CLASS ACTION COMPLAINT

1

**TRIAL BY JURY**

2   239.   Pursuant to the Seventh Amendment to the Constitution of the United States of

3          America, Plaintiff and Class Members are entitled to, and demand, a trial by jury.

4

5   Date: March 29, 2023                     Respectfully submitted,

6                                            By: *s/ Joshua Swigart*

7                                            Joshua B. Swigart, Esq.

8                                            **SWIGART LAW GROUP**
                                             2221 Camino del Rio S, Ste 308

9                                            San Diego, CA 92108
                                             Telephone: 866-219-3343

10                                           Facsimile: 866-219-8344

11                                           *Josh@SwigartLawGroup.com*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT